Robert J. Maynes, ISB No. 6905
Steven L. Taggart, ISB No. 8551
Stephen K. Madsen, ISB No. 6253
**MAYNES TAGGART PLLC**
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 552-6442
Facsimile: (208) 524-6095
Email:  mayneslaw@hotmail.com
          staggart101@gmail.com
          skmadsen.mayneslaw@gmail.com

*Counsel for R. Sam Hopkins, Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| In Re: | Case No. 13-40838 JDP |
|---|---|
| HOKU CORPORATION, | Chapter 7 |
| Debtor. | |
| R. SAM HOPKINS, Chapter 7 Trustee, | Adversary Case No. 15-_____ JDP |
| Plaintiff, | |
| vs. | |
| REACH AMERICA, LLC, a division of REACH AMERICA ESG, LTD., a California limited liability company; and John Does 1 through 10, | |
| Defendants. | |

**COMPLAINT**

COMES NOW the Plaintiff, R. SAM HOPKINS, chapter 7 trustee ("Trustee"), by and through his attorney, Robert J. Maynes, Esq. of Maynes Taggart, PLLC, and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and pursuant to the Rules of this Court and the United States District Court for the District of Idaho, in that this action arises in and relates to the Chapter 7 Bankruptcy Case filed by Hoku Corporation, the above referenced Debtor (hereinafter the "Debtor" or "Corporation") on July 2, 2013 as Case No. 13-40838 JDP.

2. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O) and to the extent that it is found to be a non-core proceeding that is otherwise related to this bankruptcy case, the non-core matters, if any, are so inextricably linked with core matters that this Court's exercise of jurisdiction is proper.

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

4. Plaintiff is the duly appointed chapter 7 trustee pursuant to 11 U.S.C. § 701 *et seq.*, empowered to pursue this action.

5. Defendant, Reach America, LLC, a division of Reach America ESG, Ltd. (hereinafter "Defendant") is a California LLC headquartered in Rosemead, California, which has conducted business in the State of Idaho.

6. Defendants, John Does 1 through 10 are unknown individuals or entities that may have an interest in the subject matter of this adversary proceeding. Plaintiff reserves the right to amend this Complaint at such time as the identities of these defendants are discovered.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

7. In March of 2001, Pacific Energy Group, LLC (now known as Hoku Corporation) was incorporated in the State of Hawaii by Dustin Shindo and Karl Taft. In July 2001, Pacific Energy Group, LLC changed its name to Hoku Scientific, Inc. (now known as Hoku Corporation). In December 2004, Hoku Scientific, Inc. was reincorporated in the state of Delaware. Hoku Scientific changed its name to Hoku Corporation in March of 2010. For convenience, all references to Hoku Corporation and its former names shall hereafter be made as "Corporation".

8. In its early stages of existence, Corporation's main business was designing, developing and manufacturing membrane electrode assemblies and membranes for proton exchange membrane for fuel cells. Hoku Fuel Cells appears to be a trade name used by Corporation for the design and development of its fuel cell technologies.

9. Over the course of its existence, Corporation owned varied equity ownership interests in a number of separate business entities. These subsidiaries conducted independent business operations that often included development of technologies and applications related to, but distinct from, Corporation's fuel cell technologies.

10. In April of 2005, Corporation completed its initial public offering (IPO) and its shares were publically traded on NASDAQ.

11. The IPO candidly disclosed that Corporation had incurred net operating losses since its creation and as of March 31, 2005 Corporation had an accumulated deficit of $6.5 million.

12. The IPO further disclosed that if Corporation was not able to generate significant revenue, then its future operations were doubtful.

13. The IPO also disclosed that Corporation relied on two contracts for substantially all of its revenue, Nissan and the U.S. Navy.

14. The Nissan contract provided that Corporation would develop customized fuel cells in Nissan's automotive fuel cells and assembly process.

15. The U.S. Navy contract provided that Corporation would develop a fuel cell power plant prototype that incorporated Corporation's fuel cells and integrated fuel cell systems.

16. In May of 2006, Corporation announced its plans to form two additional subsidiaries to reorganize its existing business to include: (1) a solar power systems subsidiary, consisting of an integrated solar power business, Hoku Solar, Inc., that would manufacture and sell solar panels, and (2) a manufacturer of polysilicon (an essential raw material used to manufacture solar panels), Hoku Materials, Inc.

17. To further its plans to restructure, Corporation announced its intent to reorganize its business operations into three separate business entities: Hoku Fuel Cells, Hoku Solar and Hoku Materials.

18. Hoku Fuel Cells constituted Corporation's fuel cell business and included the development and manufacturing of membrane electrode assemblies designed for residential primary power, commercial back-up, and automotive hydrogen fuel cell markets.

19. Hoku Solar, Inc. was a new subsidiary, created to produce and manufacture solar cells with a solar cell assembly line. In March 2007, Corporation incorporated Hoku Solar, Inc. to assemble and install their own brand of solar panels. In June 2007, Hoku Solar shifted its focus from manufacturing to installation services.

20. Hoku Materials, Inc. was a new subsidiary, created to manufacture polysilicon for sale to larger solar and integrated circuit markets. In February 2007, Corporation incorporated Hoku Materials, Inc. to manufacture polysilicon.

21. To further its plans to create and equip the Hoku Solar, Inc. and Hoku Materials, Inc. facilities, Corporation believed it would need approximately $250,000,000.00 cash, which would be raised through issuance of debt and equity securities to Corporation, and Hoku Materials Inc.'s customer prepayments for future purchases of polysilicon. The $250 million estimate was substantially less than the actual funds needed.

22. To fund its ongoing business operations, and further Corporation's subsidiaries' operations, Corporation implemented a strategy of debt financing and issuance of equity securities. Hoku Materials, Inc. contracted for pre-payment from customers, which Corporation guaranteed.

23. On information and belief, in anticipation of polysilicon deliveries, Hoku Materials, Inc. entered into a number of agreements to provide polysilicon in exchange for significant prepayments in excess of millions of dollars.

24. Corporation guaranteed or cosigned some of these prepayment agreements to facilitate Hoku Materials, Inc.'s ability to obtain necessary funds to continue plant construction.

25. On May 24, 2010, Corporation entered into a secured lending agreement with China Merchants Bank Co., Ltd. for 20 million dollars, secured by substantially all of Corporation's personal property.

26. On June 30, 2010, Corporation entered into an unsecured lending agreement with China Construction Bank Corporation for 28.3 million dollars.

27. On August 16, 2010, Corporation entered into an unsecured lending agreement with China Merchants Bank Co., Ltd. for 10 million dollars.

28. On August 26, 2010, Corporation entered into an unsecured lending agreement with China Merchants Bank Co., Ltd. for 5 million dollars.

29. On September 16, 2010, Corporation entered into an unsecured lending agreement with China Merchants Bank Co., Ltd. for 10 million dollars.

30. On October 8, 2010, Corporation entered into an unsecured lending agreement with China Merchants Bank Co., Ltd. for 13 million dollars.

31. On October 18, 2010, Corporation entered into an unsecured lending agreement with China Construction Bank Corporation for 29 million dollars.

32. On December 20, 2010, Corporation entered into an unsecured lending agreement with China Merchants Bank Co., Ltd. for 10 million dollars.

33. On December 23, 2010, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 15.5 million dollars.

34. On January 10, 2011, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 19.5 million dollars.

35. On February 7, 2011, Corporation entered into an unsecured lending agreement with CITIC Bank International Limited for 18.5 million dollars.

36. On February 25, 2011, Corporation entered into an unsecured lending agreement with Bank of China for 30 million dollars.

37. On April 6, 2011, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 15 million dollars.

38. On June 2, 2011, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 24.7 million dollars.

39. On August 16, 2011, Corporation entered into an unsecured lending agreement with Bank of China for 15 million dollars.

40. On September 1, 2011, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 10 million dollars.

41. On October 5, 2011, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 13.6 million dollars.

42. On October 12, 2011, Corporation entered into an unsecured lending agreement with Bank of China for 22.1 million dollars.

43. On November 30, 2011, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 5.8 million dollars.

44. On January 11, 2012, Corporation entered into an unsecured lending agreement with Industrial and Commercial Bank of China Limited for 10 million dollars.

45. On February 24, 2012, Corporation entered into a secured lending agreement with China Merchants Bank Co., Ltd. for 10 million dollars, secured by substantially all of Corporation's personal property.

46. On May 21, 2012, Corporation entered into a secured lending agreement with China Merchants Bank Co., Ltd. for $4.9 million dollars, secured by substantially all of Corporation's personal property.

47. The loans referenced in the foregoing paragraphs, Paragraphs 25 to 46, total approximately 339 million dollars (hereafter the "Loans").

48. Upon receipt of the proceeds from the foregoing Loans, upon information and belief, Corporation used a portion of the Loans proceeds to fund its operations, transferred portions of the Loans proceeds to its subsidiaries, and transferred significant monies to the above named Defendants.

49. There was no reasonable prospect that Corporation would be able to repay the foregoing loans.

50. In its Annual Form 10-K Report for fiscal year ended March 31, 2007 filed with the Security and Exchange Commission ("SEC"), Corporation disclosed to the public that it had incurred cumulative net losses since its inception through fiscal year 2007.

51. In its Annual Form 10-K Report for fiscal year ended March 31, 2008 filed with the SEC, Corporation disclosed to the public that it had incurred cumulative net losses since its inception through fiscal year 2008.

52. In its Annual Form 10-K Report for fiscal year ended March 31, 2009 filed with the SEC, Corporation disclosed to the public that if it were unable to secure additional financing it would be unable to continue as a going concern.

53. In its Annual Form 10-K Report for fiscal year ended March 31, 2010 filed with the SEC, Corporation disclosed to the public that it needed to secure additional financing in order to continue.

54. In its Annual Form 10-K Report for fiscal year ended March 31, 2011 filed with the SEC, Corporation disclosed to the public that it needed to secure additional financing in order to continue.

55. Based on its consolidated financials, Corporation incurred the following "losses from operations" from 2004 to 2011:

| Fiscal Year Ended March 31, | Income (Loss) from operations |
|---|---|
| 2004 | (3,031,000) |
| 2005 | (1,076,000) |
| 2006 | 482,000 |
| 2007 | (4,066,000) |
| 2008 | (5,621,000) |
| 2009 | (3,272,000) |
| 2010 | (6,079,000) |
| 2011 | (11,906,000) |

56. On or about July 26, 2012, Hanwha Solar One Hong Kong Limited (fka Solarfun Power Hong Kong Limited) ("Hanwha") filed a state court breach of contract action against Corporation and Hoku Materials, Inc. for failure to provide the polysilicon required under the 2007 Supply Agreement, and Corporation's associated guaranty, and sought the repayment of the prepaid deposits and prepayments in the amount of 49 million dollars.

57. Hanwha has filed Proof of Claim No. 15 (which is incorporated herein by this reference) in the above captioned bankruptcy for 49 million dollars, as a secured claim; however, Plaintiff is informed and believes that with regards to Corporation and assets of the Corporation bankruptcy estate, Hanwha's Proof of Claim is an unsecured claim and the asserted liability relates back to 2007 when the Supply Agreement was entered into.

58. Corporation's decision to invest in Hoku Materials, Inc. and its related polysilicon plant in 2007 appears to have been based in part on the price of polysilicon; however, polysilicon prices peaked in February 2008 at $475.00 per kilogram before plummeting to $15.83 per kilogram in December 2012, as reported in The Washington Post:



Source: Bloomberg News – The Washington Post July 23, 2013

59. Notwithstanding Corporation's historical operational losses and plummeting polysilicon prices, Corporation transferred funds from its bank account(s) to Defendants to pay, on information and belief, Hoku Material Inc.'s obligations associated with construction of the polysilicon plant and/or business operations, on the following dates and in the following amounts:

| Date of Check or Wire Transfer | Amount |
|---|---|
| 9/28/2011 | $ 89,700.00 |
| 9/28/2011 | $ 89,700.00 |
| **TOTAL:** | $179,400.00 |

And such other sums as may be shown at trial. Collectively, the foregoing transfers are referred to herein as the "Transfers".

60. Corporation has never had any legal or equitable title in the polysilicon plant and has no liability for Materials' polysilicon plant construction costs or Materials' debts.

COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS
10

61. On July 2, 2013 (the "Petition Date"), Corporation filed the above captioned bankruptcy case, Case No. 13-40838 JDP, under Chapter 7 of the United States Bankruptcy Code. On the same date, Hoku Materials, Inc. and Hoku Solar, Inc. filed their own bankruptcy cases, Case Nos. 13-40837 JDP and 13-40839, respectively.

62. According to Corporation's sworn bankruptcy schedules, on the Petition Date, Corporation only had $493,185.53 in assets and $507,885,785.83 in liabilities.

63. According to Hoku Materials, Inc.'s sworn bankruptcy schedules, on the Petition Date, Hoku Materials Inc. had $7,359,431.57 in assets and $779,031,323.28 in liabilities.

64. According to Hoku Solar, Inc.'s sworn bankruptcy schedules, on the Petition Date, Hoku Solar, Inc. had $1,079,495.59 in assets and $0.00 in liabilities.

65. The following chart shows Corporation's assets and liabilities from its sworn schedules, in contrast to the corresponding amounts from the sworn schedules of Hoku Materials, Inc. and Hoku Solar, Inc.:

|  | Corporation | Hoku Materials, Inc. | Hoku Solar, Inc. |
|---|---|---|---|
| Assets: | 493,185.53 | 7,359,431.57 | 1,079,495.59 |
| Liabilities: | (507,885,785.83) | (779,031,323.28) | 0.00 |
| Total: | (507,392,600.30) | (771,671,891.71) | 1,079,495.59 |

66. According to Corporation's sworn bankruptcy schedules, Corporation's debts exceed its assets by $507,392,600.30. That 500 million dollar deficit accumulated in the years preceding Corporation's bankruptcy filing.

67. As noted in Proof of Claim No. 18, a portion of the debt consists of unpaid taxes, for which Corporation owes the Internal Revenue Service approximately $178,000.00.

68. On March 10, 2015, the Trustee, through counsel, made a written demand on Defendant for return of the Transfers. To date, none of the Transfers have been returned.

## COUNT ONE
### AVOIDANCE OF FRAUDULENT TRANSFER (CONSTRUCTIVE FRAUD)
### (11 U.S.C. § 544(b)(1) and 28 U.S.C. § 3304)

69. Plaintiff realleges paragraphs 1 through 68, and makes the same a part of Count One as though fully set out herein.

70. During the six (6) years preceding Corporation's bankruptcy filing, Corporation transferred an amount according to proof, but not less than $179,400.00, to Defendant for payment of Materials' debts, for which Corporation had no liability.

71. Corporation, and by extension Corporation's creditors, did not receive reasonably equivalent value for the Transfers.

72. Given the information contained in Corporation's petition and schedules, Corporation was grossly insolvent.

73. Corporation was insolvent at the time of the Transfers or became insolvent as a result of the Transfers.

74. Corporation was engaged in business for which its remaining assets were unreasonably small in relation to Corporation's business.

75. Corporation reasonably believed or should have believed that it would incur debts beyond its ability to pay as such debts became due.

76. The Transfers are avoidable pursuant to 11 U.S.C. § 544(b)(1) and 28 U.S.C. § 3304(a)(1) and (b)(1)(B).

77. Pursuant to 11 U.S.C. § 550(a)(1) the Trustee may recover the Transfers from Reach America, LLC, a division of Reach America ESG, Ltd as the initial transferee.

78. Pursuant to 11 U.S.C. § 550(a)(2) the Trustee may recover the Transfers from John Does 1 through 10 as the immediate transferees of the initial transferee, Defendant.

79. Trustee has been required to retain the services of Maynes Taggart, PLLC to prosecute this action and agreed to pay a reasonable attorney fee and costs incurred; that $10,000.00 is a reasonable attorney fee should the action result in a default judgment, plus such other sums as the Court deems proper should the action be contested; that said fees and costs should be awarded pursuant to 28 U.S.C. § 3306(a) and *Idaho Code* §§ 12-120, 12-121, and 55-906 and to the extent equity requires in order for the Corporation bankruptcy estate be made whole. Further, Trustee is entitled to recover his pre-judgment interest.

*COUNT TWO*
*AVOIDANCE OF FRAUDULENT TRANSFER (CONSTRUCTIVE FRAUD)*
*(11 U.S.C. § 544(b)(1) & Idaho Code § 55-913(1)(b) & § 55-914)*

80. Plaintiff realleges paragraphs 1 through 79, and makes the same a part of Count Two as though fully set out herein.

81. During the four (4) years preceding the Corporation's bankruptcy filing, Corporation transferred an amount according to proof, but not less than $179,400.00, to Defendant for payment of Materials' debts, for which Corporation had no liability.

82. Corporation, and by extension Corporation's creditors, did not receive reasonably equivalent value for the Transfers.

83. Given the information contained in Corporation's petition and schedules, Corporation was grossly insolvent.

84. Corporation was insolvent at the time of the Transfers or became insolvent as a result of the Transfers.

85. Corporation was engaged in business for which its remaining assets were unreasonably small in relation to Corporation's business.

86. Corporation reasonably believed or should have believed that it would incur debts beyond its ability to pay as such debts became due.

87. The Transfers are avoidable pursuant to 11 U.S.C. § 544(b)(1) and *Idaho Code* § 55-913(1)(b) & § 55-914.

88. Pursuant to 11 U.S.C. § 550(a)(1) the Trustee may recover the Transfers from Defendant as the initial transferee.

89. Pursuant to 11 U.S.C. § 550(a)(2) the Trustee may recover the Transfers from John Does 1 through 10 as the immediate transferees of the initial transferee, Defendant.

90. Trustee has been required to retain the services of Maynes Taggart, PLLC to prosecute this action and agreed to pay a reasonable attorney fee and costs incurred; that $10,000.00 is a reasonable attorney fee should the action result in a default judgment, plus such other sums as the Court deems proper should the action be contested; that said fees and costs should be awarded pursuant to Idaho Code §§ 12-120, 12-121, and 55-906 and to the extent equity requires that the estate be made whole.  Further, Trustee is entitled to recover his pre-judgment interest.

## COUNT THREE
## AVOIDANCE OF FRAUDULENT TRANSFER (CONSTRUCTIVE FRAUD)
## (11 U.S.C. § 548(a)(1)(B))

91. Plaintiff realleges paragraphs 1 through 90, and makes the same a part of Count Three as though fully set out herein.

92. During the two (2) years preceding Corporation's bankruptcy filing, Corporation transferred an amount according to proof, but not less than $179,400.00, to Defendant for payment of Materials' debts, for which Corporation had no liability.

93. Corporation, and by extension Corporation's creditors, did not receive reasonably equivalent value for the Transfers.

94. Given the information contained in Corporation's petition and schedules, Corporation was grossly insolvent.

95. Corporation was insolvent at the time of the Transfers or became insolvent as a result of the Transfers.

96. Corporation was engaged in business for which its remaining assets were unreasonably small in relation to Corporation's business.

97. Corporation reasonably believed or should have believed that it would incur debts beyond its ability to pay as such debts became due.

98. Such Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

99. Pursuant to 11 U.S.C. § 550(a)(1) the Trustee may recover the Transfers from Defendant as the initial transferee.

100. Pursuant to 11 U.S.C. § 550(a)(2) the Trustee may recover the Transfers from John Does 1 through 10 as the immediate transferees of the initial transferee, Defendant.

101. Trustee has been required to retain the services of Maynes Taggart, PLLC to prosecute this action and agreed to pay a reasonable attorney fee and costs incurred; that $10,000.00 is a reasonable attorney fee should the action result in a default judgment, plus such other sums as the Court deems proper should the action be contested; that said fees and costs should be awarded pursuant to Idaho Code §§ 12-120, 12-121, and 55-906 and to the extent equity requires that the estate be made whole. Further, Trustee is entitled to recover his pre-judgment interest.

**WHEREFORE, Plaintiff prays for Judgment against Defendants as follows:**

  A. On Count One, for a money judgment against Reach America, LLC, a division of Reach America ESG, Ltd, John Does 1 through 10, jointly and severally, in an amount according to proof, but not less than $179,400.00; or

  B. On Count Two, for a money judgment against Reach America, LLC, a division of Reach America ESG, Ltd, John Does 1 through 10, jointly and severally, in an amount according to proof, but not less than $179,400.00; or

  C. On Count Three, for a money judgment against Reach America, LLC, a division of Reach America ESG, Ltd, John Does 1 through 10, jointly and severally, in an amount according to proof, but not less than $179,400.00; and

  D. On all Counts, that Plaintiff be awarded a reasonable attorney's fee in the sum of $10,000.00 should this action terminate as a default judgment, together with such other and additional sums as the Court deems just and proper should the action be contested pursuant to 28 U.S.C. § 3306(a) and *Idaho Code* §§ 12-120, 12-121, and 55-906 and to the extent equity requires in order for the Corporation bankruptcy estate be made whole, plus court costs;

  E. Prejudgment interest as allowed by law; and

  F. For such other and further relief as the Court may deem just and proper.

  DATED: June 13, 2015

  MAYNES TAGGART PLLC

  */s/ Robert J. Maynes*
  ROBERT J. MAYNES
  Plaintiff's counsel

COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS